**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT A. WILLIAMS** <br><br> Plaintiff, <br><br> v. <br><br> **LG CHEM, LTD.** <br> Serve:  LG Twin Towers, 128 <br>              Yeoui-daero, Yeongdeungpo-gu <br>              Seoul, South Korea <br><br> and <br><br> **LG CHEM AMERICA, INC.** <br> Serve:  Corporation Service Company <br>              40 Technology Pkway South, #300 <br>              Gwinnet, NORCROSS, GA 30092 <br><br> Defendants. | Case No.  4:21-cv-966 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Like thousands of other consumers, Robert A. Williams was injured when a lithium-ion battery he was carrying inside his pocket suddenly exploded. Unbeknownst to him, the company that designed and manufactured the battery—global behemoth LG—had long been aware of the risks of such sudden explosions. These risks were particularly acute for batteries used with e-cigarette devices, such as Mr. Williams's. Despite these risks, LG sold lithium-ion batteries by the millions—with hundreds of thousands of them specifically targeted for sale in the United States—generating enormous profits for the company. Many of these batteries, including Mr. Williams's battery, were knowingly defective, and yet were sold by LG (and its wholly owned subsidiary LG Chem America) for eventual use in the United States. Mr. Williams brings this suit against LG and LG Chem America to hold them accountable for their unlawful conduct and to seek redress for the extensive physical injuries that their conduct has caused him to suffer.

## PARTIES

1. Plaintiff Robert A. Williams is and was a resident of St. Louis, Missouri. He purchased a 18650 lithium-ion battery manufactured by LG from a retailer in Missouri, and later suffered injury in Missouri when that battery exploded while inside of his pocket.

2. Defendant LG is a global chemical-based company founded in Korea in 1947. It boasts of leading the global market with its manufacture and sale of lithium-ion batteries, including the cylindrical 18650 batteries at issue in this case.

3. Although LG allegedly does not maintain any physical presence in the United States, it does extensive business in Missouri through its distributors and subsidiaries, including Defendant LG Chem America, Inc., which act as its servants, agents, and/or employees. Through this extensive distribution network, Defendants LG and LG Chem America have knowingly and purposefully flooded the U.S. market (and the market in the State of Missouri in particular) with lithium-ion batteries, including cylindrical 18650 lithium-ion batteries.

4. LG ships lithium-ion batteries and other products directly into the United States from Korea, and in turn, its distributors (including LG Chem America) fulfill delivery and distribution of the products within the United States. This includes systematically selling, shipping, and distributing cylindrical 18650 batteries throughout the United States, including Missouri.

5. LG designed, manufactured, distributed, sold, and/or otherwise placed the cylindrical lithium-ion battery that injured the Plaintiff into the stream of commerce. Cylindrical 18650 lithium-ion batteries were advertised, marketed, sold, distributed, and placed into the stream of commerce through the engagement of the Defendants and one or more distributors and/or retailers who sell and distribute LG products, including 18650 lithium-ion batteries, to consumers.

6. LG also sells lithium-ion batteries, including 18650 batteries, to Chinese companies that it knows to be distributors of e-cigarette and personal vaping products. LG knows that these companies then distribute these batteries to e-cigarette and vaping retailers, wholesalers, and distributors in the United States and specifically into Missouri.

7. LG has a yearly revenue of over $278 million attributable to batteries sold or imported into the United States and $2.4 billion worldwide.

## VENUE

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because it is where a substantial part of the events or omissions giving rise to the claim occurred.

## JURISDICTION

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the Plaintiff and the Defendants are diverse and the amount in controversy exceeds $75,000.00.

10. This Court has personal jurisdiction over the Defendants because each Defendant maintains purposeful, continuous, and systematic contacts with Missouri entities and the Missouri market with respect to lithium-ion batteries, including 18650 lithium-ion batteries, and these products are sold throughout Missouri. The regular course and scope of Defendants' business involves shipping huge quantities of its batteries, including 18650 lithium-ion batteries, into and throughout Missouri, and each Defendant has specifically shipped tens of thousands of lithium-ion batteries into Missouri. Upon information and belief, these batteries (including 18650 batteries) were during the relevant time period sold both as stand-alone batteries at retailers in Missouri and as component parts in products sold in Missouri. This suit arises out of or relates to the Defendants' contacts with Missouri because it involves an injury to a Missouri resident that occurred in Missouri and was caused by an LG-manufactured 18650 lithium-ion battery sold in Missouri.

11.     Based upon information and belief, LG also sells 18650 lithium-ion batteries (many of which have a missing or defective wrapper) to various distributors throughout the world, including in China. These distributors then apply their own wrapper and sell the batteries for other uses. LG knows and expects that these batteries will be sold in large quantities throughout the United States, including in Missouri, with many of the batteries being targeted specifically for the electronic-cigarette market. Based on information and belief, Defendants' marketing, advertising, sale, distribution network, and provision of batteries to Missouri resulted in the use of thousands, if not millions, of LG products, particularly cylindrical lithium-ion batteries, in the State of Missouri, and comprising one of LG's primary distribution channels for its products.

12.     In addition, LG maintains an active and interactive website where it can exchange information with Missouri residents at https://www.lgchem.com/, where Missouri residents can research and interact with the various divisions within LG. Included within that website is the ability to email the division responsible for manufacturing, researching, designing, selling, and marketing the lithium-ion batteries. To inquire about those batteries, the user must consent to have their personal information collected by LG, including their name, number, inquiry type, subject, content, and IP address and access location/date/time, which LG then stores and maintains for at least one year. LG promises that "A reply will be sent to the email address you entered. Please enter it correctly." Based on information and belief, large numbers of individuals and entities located in Missouri browsed the LG website, obtaining information on the company and its products. Of those, at least a reasonable number made inquiries to LG from Missouri about purchasing its products or with inquiries about those products, to which LG guarantees that "a reply will be sent"—sending replies to Missouri customers and distributors and seeking to further distribute and sell its products to Missouri users.

13. Jurisdiction over LG is also necessary in this Court because, despite LG knowingly flooding the U.S. market with millions of 18650 batteries, many of which were knowingly defective, and profiting from each sale—and despite thousands of consumers having been injured by its lithium-ion batteries—LG maintains that there is not a single jurisdiction in the United States where it can be sued.

## FACTUAL ALLEGATIONS

**E-Cigarettes**

14. E-cigarettes, also known as e-cigs, vapes, vape pens, and mods (which are customizable, more powerful vaporizers), are battery-operated devices that deliver nicotine through flavoring and other chemicals to users in the form of vapor instead of smoke.[1] They were first patented in 2003 and have been available for sale in the United States since 2007.[2]

15. E-cigarettes are designed to simulate the act of smoking traditional tobacco, allegedly with less of the toxic chemicals produced by the burning of tobacco leaves and other chemicals contained in traditional, combustible cigarettes.[3] E-cigarettes offer doses of nicotine with a vaporized solution, often referred to as "juice," "e-liquid," or "pods," providing a physical sensation similar to tobacco smoke.

16. E-cigarettes typically operate the same way regardless of the model, consisting of at least three component parts: a tank, a battery that works to heat the juices or e-liquid contained in the tank, and an atomizer that converts the liquid into vapor that the user inhales.

---

[1] *See generally*, *Electronic Cigarettes*, Nat'l Inst. on Drug Abuse, Rev. Mar. 2018, *available at* https://www.drugabuse.gov/publications/drugfacts/electronic-cigarettes-e-cigarettes.
[2] McKenna, L., *Electronic Cigarette Fires and Explosions in the United States 2009-2016*, U.S. Fire Admin., July 2017 *available at* https://www.usfa.fema.gov/downloads/pdf/publications/electronic_cigarettes.pdf.
[3] *See generally*, *Electronic Cigarettes*, Nat'l Inst. on Drug Abuse, Rev. Mar. 2018, *available at* https://www.drugabuse.gov/publications/drugfacts/electronic-cigarettes-e-cigarettes.

5

17. E-cigarettes thus differ from traditional cigarettes in a critical way: the e-cigarette is battery-operated and uses a heating element to produce vapor, whereas the traditional cigarette has no electronic component. While both products may produce a similar physical sensation, e-cigarettes pose an additional danger—the battery-powered heating element, as well as the battery itself—that can cause, and has caused, explosions, fires, and serious injury. Further, e-cigarettes are more dangerous than other products that contain lithium batteries because the e-cigarette is most often designed as a cylindrical device, requiring a lithium-ion battery of a similar shape. When the device malfunctions or fails, the battery can be shot out like a bullet or rocket.[4]

18. At least two deaths have been reported in relation to an exploding e-cigarette.[5]

19. E-cigarettes have become increasingly popular in recent years. They have been marketed as smoking-cessation aids[6] and as a healthier alternative to traditional tobacco cigarettes. The variety and selection of products available to consumers has grown at an extremely rapid rate.[7]

20. Since their introduction into the United States, sales have risen dramatically—from approximately $20 million in 2008 to $2.5 billion in 2012. Industry experts predict the e-cigarette industry will become an $85 billion business within a decade and surpass the tobacco industry.[8]

---

[4] *See* U.S. Fire Admin., *Electronic Cigarette Fires and Explosions*, Oct. 2012, at p. 5.
[5] *See* https://www.washingtonpost.com/health/2019/02/05/vape-pen-kills-man-after-exploding-his-mouth/.
[6] *Id.*
[7] Zhu, S. H., Sun, J. Y., Bonnevie, E., Cummins, S., Gamst, A., Yin, L., & Lee, M. (2014), Four hundred and sixty brands of e-cigarettes and counting: Implications for product regulation. Tobacco Control Act 2014, 23: iii3-iii9.
[8] Clarke, T., *Reports of E-Cigarette Injury Jump Amid Rising Popularity, United States Data Show*, Reuters.com, Apr. 17, 2012.

21. Until recently, e-cigarette marketing has been unfettered and unregulated. Whereas tobacco advertisements have been banned on radio and TV for over 40 years, no such restrictions yet exist for e-cigarettes. Manufacturers, distributors, and sellers of e-cigarettes therefore reach a broader consumer base than the tobacco industry and have the freedom to use the same marketing tactics previously used by big tobacco—namely, to tout the supposed health benefits of their products without supporting scientific and medical data; to portray e-cigarette smoking as a harmless pastime on TV, radio, and in print; to capitalize on those already addicted to nicotine; and to encourage nicotine newcomers (mainly youths and young adults) to pick up the habit.

22. In 2017, the United States Fire Administration characterized the "combination of an electronic cigarette and a lithium-ion battery" as a "new and unique hazard" because there is "no analogy among consumer products to the risk of a severe, acute injury presented by an e-cigarette."[9]

**LG Sells Lithium-Ion Batteries Knowing They Will and Would Be Used with E-Cigarettes**

23. Defendant LG reportedly does not maintain any physical presence in the United States. It has a network of wholly owned subsidiaries in and throughout the United States that work together to sell various LG products nationwide.

24. LG documents characterize the business activities of one such subsidiary, Defendant LG Chem America, as "sales and trading" of LG's products in the United States, and LG created LG Chem America for the specific purpose of "sales and trading" of LG products in the U.S. Additionally, upon information and belief, LG Chem America was involved in the design and specification of LG lithium-ion 18650 batteries to be sold in the United States.

---

[9] McKenna, L., *Electronic Cigarette Fires and Explosions in the United States 2009-2016*, U.S. Fire Admin., July 2017.

7

25. LG is a global supplier of products and touts its global reach. It describes itself as "leading the chemical industry in Korea," and proudly proclaims that it "has built the global network for production, sales, and R&D not only in Korea but also in main bases across the world and has provided globally competitive product," and thus that "LG Chem is committed to becoming a global company."

26. LG also emphasizes that it is the "only chemistry-based company among global battery cell manufacturers," "has led the world lithium-ion battery market," is "positioned as a global leader," and "has secured the battery production capacity as a global player."

27. LG sells its batteries worldwide, using distributors across the globe, including its subsidiary LG Chem America. This is true in Missouri, where upon information and belief, LG and LG Chem America ship lithium-ion batteries directly to Missouri entities.

28. Upon information and belief, the regular course and scope of Defendants' business involves the shipping of large quantities of its batteries, both the cylindrical lithium-ion battery at issue here as well as LG's other energy storage products, into Missouri and beyond.

29. Based on information and belief, since at least 2012, LG and LG Chem America have supplied, sold, shipped, distributed and provided directly to consumers and distributors throughout the State of Missouri thousands (if not millions) of its products, including cylindrical lithium-ion batteries, which were sold for use in, and were in fact used in, Missouri.

30. Based on information and belief, LG and LG Chem America marketed, advertised, targeted, and promoted the sale of its various products, including lithium-ion batteries, to numerous consumers and distributors throughout Missouri. Upon information and belief, those distributors, and other distributors located throughout the United States and the world, in turn sold large quantities of products, including LG lithium-ion batteries, to wholesalers and retailers located

8

in Missouri for the direct sale to Missouri consumers, where these products were purchased by Missouri residents and used in this State.

31. In addition to the authorized LG batteries shipped directly to Missouri, LG also engages, upon information and belief, in a grading process for the batteries that it manufacturers. Upon information and belief, the batteries that fail to achieve a sufficient grade or conform appropriately to standards are not discarded by LG. Instead, LG seeks to profit off those knowingly inferior or nonconforming lithium-ion battery products by selling them to other distributors, with LG knowing full well that those distributors would then sell the nonconforming batteries for individual electronic or other uses. These uses might not be explicitly authorized, but they are permitted by LG in the interest of maintaining its profitability. Based upon information and belief, in the manufacturing process, LG also ends up with a significant quantity of batteries with cosmetic defects in the wrapper, without a wrapper at all, or with other types of cosmetic or other defects. Again, instead of discarding those batteries, LG knowingly sells those substandard batteries to various distributors throughout the world to remove the cosmetically defective or missing wrapper, apply their own wrapping, and then sell those batteries for other uses. Those batteries are then sold to consumers throughout the world, and readily and rapidly reach Missouri, all at the reasonable expectation or explicit knowledge of LG. One of the principal locations to which LG ships its substandard batteries is Shenzhen, China.

32. Based on these two avenues, Defendants ultimately sells huge quantities of lithium-ion batteries that end up in the electronic cigarette market in Missouri, and end up in the hands of Missouri consumers, including upon information and belief, the battery at issue in this matter.

33. Upon information and belief, Defendants' marketing, advertising, sale, distribution network, and provision of batteries to Missouri resulted in the use of thousands, if not millions, of LG products, particularly cylindrical lithium-ion batteries (including 18650 batteries), in the State of Missouri, and comprising one of LG's primary distribution channels for its products.

34. LG has a yearly revenue of over $278 million attributable to batteries sold or imported into the United States and $2.4 billion worldwide.

35. LG exercises pervasive and tight control over the sales and trading activities of its subsidiaries, including LG Chem America, which it created solely for the purpose of acting as an instrumentality through which LG could sell and distribute its products, including batteries, in the United States.

36. This case involves the explosion of a lithium-ion battery that was designed, manufactured, distributed, and sold by LG. On information and belief, this battery and other similar or identical 18650 lithium-ion batteries were advertised, marketed, sold, distributed, and placed into the stream of commerce by LG and one or more distributors, including LG Chem America, and/or retailers who sell and distribute LG products, including lithium-ion batteries, to consumers.

37. Despite the significant profit that LG garners from its U.S-based business, it asserts that it is not subject to the jurisdiction of any court (state or federal) in the United States.

38. For at least the last six years, it has been well known in the e-cigarette industry, and upon information and belief, well known to LG, that its lithium-ion batteries were being used in e-cigarettes and were even recommended by multiple online sources for e-cig use.

39. LG lithium-ion batteries can carry a catastrophic risk of explosion to consumers, and this risk is well-known to the company. Indeed, on the primary search engine used in LG's home country, South Korea, there are hundreds of news articles detailing the explosion issues with e-cigarette batteries such as LG's 18650 battery (the type that exploded here). These articles began to appear as early as February 2012 and detail a spate of explosions across the world, damaging and burning faces, mouths, hands, legs, and bodies.

40. Regulators in the United States and elsewhere quickly took notice. The U.S. Fire Administration, for example, published a report in October 2014 detailing fires and explosions in electronic cigarettes dating back to 2009; the U.S. Dept of Transportation permanently banned e-cigs in checked baggage in 2016; and the FDA has been expressing concern for these dangerous products for years. Finally, based on information and belief, LG has been named, or is about to be named, as a defendant in hundreds of electronic cigarette explosions across the country, where one of its batteries has caused catastrophic injuries to people throughout the U.S. and around the world.

41. Despite the Defendants' knowledge, LG batteries were (and continue to be) widely, readily, and easily available at a-cigarette retail stores throughout Missouri, as well as available for direct shipment online from Amazon, Alibaba, Walmart, and other online retailers. LG has long known, tolerated, and permitted this alternative use of its lithium-ion batteries as a way to increase profits. Only recently, with the spike in explosions of LG batteries—and resulting bad press—has LG taken any action to attempt to stem the tide of its batteries reaching Missouri, posting an insufficient "warning" to its website. And even then, the "warning" was, upon information and belief, posted only in 2019, and admits that "LG Chem has learned that some individual consumers purchase and use its cylindrical lithium-ion battery cells ... in e-cigarettes and Vape Products that incorporate replaceable and rechargeable individual Li-Ion Cells."

**Plaintiff's Injury**

42.     Prior to June 23 2018, Plaintiff Robert A. Williams purchased an LG-manufactured 18650 lithium-ion batteries and mod-type e-cigarette from a retail store in Missouri.

43.     On August 7, 2018, Mr. Williams was at his job when two of those batteries—batteries designed, manufactured, and sold by LG—exploded in his pocket.

44.     As a result of the explosion, Mr. Williams suffered severe burn injuries to his right thigh, right ankle, right lower extremity, genitalia, and fingers.

45.     Mr. Williams was taken to Progress West Hospital in St. Louis where he was treated for serious burn injuries.  His treatment included, but was not limited to, burn excision and split thickness skin grafting.

### COUNT I
### STRICT PRODUCTS LIABILITY
### ALL DEFENDANTS

46.     At all times mentioned herein, Defendants were engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, warranting, wholesaling, supplying, and/or marketing lithium-ion batteries, including 18650 lithium-ion batteries such as the one at issue here, throughout the United States by means of interstate commerce.

47.     The battery that exploded and caused the Plaintiff's injuries was designed, manufactured, assembled, inspected, marketed, sold, and otherwise distributed by Defendants in the regular course of their business.

48.     At the time of Plaintiff's injuries, this battery was in a defective condition and was unreasonably dangerous when put to a reasonably anticipated use in that:

   a. The battery had an unreasonable propensity to heat, catch fire, and explode during normal and foreseeable conditions;

    b. The battery was not reasonably safe in its design, resulting in excessive overheating, causing it to catch fire and explode in the course of intended use and in the course of non-use;

    c. LG knowingly failed to adequately test the battery before and during its design, production, and sale to the public and/or knowingly placed the dangerously designed lithium ion batteries into the stream of commerce;

    d. The battery failed to have adequate, if any, short-circuit protection;

    e. The battery had inadequate, if any, overload protection;

    f. The battery had inadequate, if any, voltage-control protection;

    g. The battery was prone to thermal runaway;

    h. LG failed to adequately warn of the hazards presented by the battery, including but not limited to the risk of explosion;

    i. LG failed to warn, instruct, or direct users not to place the battery (and other similar or batteries) in their pocket with other contents, which exacerbated safety risks; and

    j. Such further defects as the discovery and evidence will reveal.

49. The defective and unreasonably dangerous condition of Plaintiff's battery existed at the time that the battery was designed, manufactured, sold, and/or distributed by Defendants.

50. At the time that Defendants sold the battery, they knew of its defective condition. Specifically, Defendants had actual knowledge that its lithium-ion batteries could explode under normal and foreseeable circumstances, and even during nonuse, and were unreasonably dangerous in the hands of the individual consumer.

51. At the time of the incident, Plaintiff's battery was in substantially the same condition as when designed, manufactured, distributed or sold.

52. The defects described above directly caused or contributed to Plaintiff's injuries.

53. As a direct and proximate result of the battery's defective and unreasonably dangerous condition, Plaintiff sustained severe, disabling, and permanent personal injuries. He has undergone multiple surgical procedures and has suffered and will continue to suffer severe physical and emotional pain and mental anguish.

54. As a direct and proximate result of the battery's defective and unreasonably dangerous condition, Plaintiff has become indebted for extensive reasonable and necessary medical care and treatment and will continue to incur further expenses in the future.

55. As a direct and proximate result of the battery's defective and unreasonably dangerous condition, Plaintiff's ability to work and earn wages and income has been and will continue to be lost, diminished, and/or impaired.

56. The aforesaid misconduct of Defendants constituted a gross and conscious indifference to and a willful, wanton, and reckless disregard for the safety of the general public, including Plaintiff, thus justifying and requiring punitive damages to be assessed against Defendants in a sum that will deter Defendants and others from such misconduct in the future.

57. Plaintiff prays for judgment against Defendants for a fair and reasonable amount in excess of $75,000.00, for punitive damages, costs herein incurred, prejudgment interest, post judgment interest, and for such other and further relief as may be just and proper.

**COUNT II**
**NEGLIGENCE**
**ALL DEFENDANTS**

58. Defendants had a duty to exercise reasonable care in designing, manufacturing, marketing, supplying, selling, leasing, or otherwise distributing and placing lithium-ion batteries in the stream of commerce, including the battery at issue in this lawsuit.

59. Defendants designed, manufactured, assembled, sold, and distributed the Plaintiff's battery in the regular course of its business.

60. Defendants failed to exercise ordinary care thereby breaching its duty to Plaintiff and to others in one or more of the following ways:

   a. Defendants negligently and carelessly designed, manufactured, marketed, distributed, and/or sold defectively designed unreasonably dangerous lithium-ion batteries;

   b. Defendants negligently and carelessly failed to design the Plaintiffs' battery such that it would not heat, catch fire, and explode during normal and foreseeable use and non-use;

   c. Defendants negligently and carelessly failed to adequately test the battery before and during its design, production, and sale to the public and negligently and carelessly placed the dangerously designed lithium-ion batteries into the stream of commerce;

   d. Defendants negligently and carelessly designed, manufactured, and sold lithium-ion batteries that failed to have adequate, if any, short-circuit protection;

   e. Defendants negligently and carelessly designed, manufactured, and sold lithium-batteries in vapes that had inadequate, if any, overload protection;

   f. Defendants negligently and carelessly failed to implement adequate, if any, voltage control system in the Plaintiffs' battery;

   g. Defendants negligently and carelessly designed, manufactured, and sold lithium ion batteries prone to thermal runaway;

h. Defendants negligently and carelessly failed to adequately warn of the hazards presented by the Plaintiff's battery, including the risk of fire and explosion;

i. Defendants negligently and carelessly failed to warn, instruct, or direct users not to place lithium-ion batteries in their pocket with other contents;

j. Defendants negligently and carelessly sold the Plaintiff's battery without restriction as to how it could be used or sold;

k. Defendants negligently and carelessly failed to institute or maintain adequate policies and procedures for monitoring the safety performance of the lithium-ion batteries, including the Plaintiff's battery, it placed into the stream of commerce;

l. Defendants negligently and carelessly failed to monitor the safety performance of the lithium ion batteries, including the battery at issue in this case, that it placed into the stream of commerce;

m. Defendants negligently and carelessly failed to manage their supply chain concerning 18650 lithium-ion batteries, allowing millions of defective 18650 batteries to be flooded and sold into the consumer marketplace;

n. Defendants knowingly allowed lithium-ion batteries that it knew could explode if used by consumers to be placed in the control of authorized and non-authorized distributors who then sold the batteries to consumers;

o. Defendants authorized and allowed distributors to sell the Plaintiff's battery for an unintended purpose;

p. Defendants negligently and carelessly failed to take corrective action, including recalls to eliminate the hazard, guard against the hazard, or warn the Plaintiff and public of the danger of potential explosion of lithium-ion batteries; and

  q. Such further negligence as discovery and the evidence will reveal.

61. Defendants knew or reasonably should have known that death or severe bodily injury was substantially likely to occur as a result of its acts and omissions as described above.

62. The conduct as described above directly caused or contributed to cause Plaintiff's injuries.

63. As a direct and proximate result of the negligent acts and/or omissions described above, Plaintiff sustained severe, disabling, and permanent personal injuries. He has undergone multiple surgical procedures and has suffered and will continue to suffer severe physical and emotional pain and mental anguish.

64. As a direct and proximate result of the negligent acts and/or omissions described above, Plaintiff has become indebted for extensive reasonable and necessary medical care and treatment and will continue to incur further expenses in the future.

65. As a direct and proximate result of the negligent acts and/or omissions described above, Plaintiff's ability to work and earn wages and income has been and will continue to be lost, diminished, and/or impaired.

66. The Defendants' misconduct constituted a gross and conscious indifference to and a willful, wanton, and reckless disregard for the safety of the general public, including the Plaintiff, and showed a want of care raising the presumption of conscious indifference to the consequences, thus justifying and requiring punitive damages to be assessed against Defendants in a sum that will deter Defendants and others from such misconduct in the future.

67. Plaintiff prays for judgment against Defendants for a fair and reasonable amount in excess of $75,000.00, for punitive damages, costs herein incurred, prejudgment interest, post judgment interest, and for such other and further relief as may be just and proper.

## COUNT III
## NEGLIGENT PERFORMANCE OF UNDERTAKING TO RENDER SERVICES
## ALL DEFENDANTS

68. Restatement (Second) of Torts § 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking

69. Defendants knowingly allowed millions of LG batteries to enter the stream of commerce for consumer use, despite actual knowledge that such products posed a serious risk of harm if used by individual consumers.

70. After becoming aware of the risks, Defendants undertook to render services to maintain its supply chain and warn consumers about the risks posed by their defective batteries in the following ways:

   a. Defendants issued a declaration of commitment to their customers in an attempt to restrict retailers from selling LG batteries to individual consumers, for any use;

   b. Defendants placed warning labels on the cells and posted warning information on their company website;

   c. Defendants began a public relations campaign in order to inform the public of the dangers in using their batteries with e-cigarettes;

   d. Defendants updated the language on the battery label with the intent to make the warning messages clearer;

   e. Defendants issued warnings to certain vape shops in the United States to inform those shops that LG lithium-ion batteries were not to be sold for e-cigarette use;

18

    f.    Defendants held meetings with the FDA to alert them about LG's knowledge of the situation regarding the use of LG batteries in e-cigarettes; and

    g.    Such further undertakings as discovery and evidence will reveal.

71.    Defendants recognized that the actions described above were necessary to protect consumers, such as Plaintiff.

72.    Defendants failed to exercise reasonable care in its undertaking to fix the supply chain or notify customers, retailers, and e-cigarette distributors of the danger that LG's lithium-ion batteries posed. Instead, to maximize profits, Defendants continued to acquiesce in the sale of its defective batteries to entities that it knew should not be selling them due to the risk of explosion.

73.    Plaintiff relied on Defendants' undertaking to control its supply chain and warn upstream entities when purchasing and using the battery in this case.

74.    As a result of this reliance, Plaintiff suffered serious physical harm.

75.    As a direct and proximate result of the acts and/or omissions described above, Plaintiff sustained severe, disabling, and permanent personal injuries. He has undergone multiple surgical procedures and has suffered and will continue to suffer severe physical and emotional pain and mental anguish.

76.    As a direct and proximate result of the negligent acts and/or omissions described above, Plaintiff has become indebted for extensive reasonable and necessary medical care and treatment and will continue to incur further expenses in the future.

77.    As a direct and proximate result of the negligent acts and/or omissions described above, Plaintiff's ability to work and earn wages and income has been and will continue to be lost, diminished, and/or impaired.

78. The aforesaid misconduct of Defendants constituted a gross and conscious indifference to and a willful, wanton, and reckless disregard for the safety of the general public, including Plaintiff, and showed an want of care raising the presumption of conscious indifference to the consequences thus justifying and requiring punitive damages to be assessed against Defendants in a sum that will deter Defendants and others from such misconduct in the future.

79. Plaintiff prays for judgment against Defendants for a fair and reasonable amount in excess of $75,000.00 in special and compensatory damages; for punitive damages; for costs herein incurred, prejudgment interest, post judgment interest, and for such other and further relief as may be just and proper.

DATED:  August 3, 2021                           Respectfully Submitted

**THE SIMON LAW FIRM, P.C.**

By: */s/ John M. Simon*
John M. Simon #68393MO
John G. Simon, #35231MO
800 Market Street, Suite 1700
Saint Louis, Missouri 63101
P: (314) 241-2929
F: (314) 241-2029
jmsimon@simonlawpc.com
jsimon@simonlawpc.com
**Attorneys for Plaintiffs**

And

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR (PHV PENDING)
DEEPAK GUPTA (PHV PENDING)
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 N
Washington, DC 20006
(202) 888-1741
(202) 888-7792 (fax)
jon@guptawessler.com
deepak@guptawessler.com